United States v. Oehne

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: October 15, 2012                    Decided: October 25, 2012)

Docket No. 11-2286-cr

_____

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

WILLIAM OEHNE, aka William Karl Ludwig Oehne, Jr.,

*Defendant-Appellant*.

_____

B e f o r e :

KEARSE and KATZMANN, *Circuit Judges*, GLEESON, District Judge[*].

_____

Appeal from a judgment of conviction and sentence entered by the United States District Court for the District of Connecticut (Janet Hall, *Judge*), on June 6, 2011, sentencing Defendant-Appellant to 540 months' imprisonment for the production and distribution of child pornography. We hold that the district court did not err in determining that Defendant-Appellant did not invoke his right to counsel during an interrogation and that the sentence was procedurally and substantively reasonable. **AFFIRMED**

_____

---

[*] The Honorable John Gleeson, of the United States District Court for the Eastern District of New York, sitting by designation.

DAVID B. FEIN, United States Attorney for the District of Connecticut (Krishna R. Patel, Robert M. Spector, Assistant United States Attorneys, *on the brief*), New Haven, Conn., *for Appellee.*

FRANK J. RICCIO II (Frank J. Riccio, *on the brief*), Law Offices of Frank J. Riccio LLC, Bridgeport, Conn., *for Defendant-Appellant.*

––––––––––––––––

PER CURIAM:

Defendant-Appellant William Oehne appeals from a June 6, 2011 judgment of conviction and sentence entered by the United States District Court for the District of Connecticut (Hall, *J.*). On October 19, 2010, Oehne pled guilty, pursuant to a plea agreement, to both counts of a two-count indictment charging him with production of child pornography, in violation of 18 U.S.C. § 2251(a), and distribution of child pornography, in violation of 18 U.S.C. § 2252A(a)(2). In the stipulation of offense conduct, Oehne admitted to having sexually abused the daughter of a woman with whom he lived. The abuse began when the daughter (the "minor victim" or "MV") was eight years old and continued for about two years. Oehne photographed the abuse and distributed the images on the Internet, "resulting in one of the most prolific series of child pornography viewed worldwide." Gov't Br. 1-2. The district court sentenced Oehne principally to 540 months' imprisonment to be followed by a life term of supervised release.

Having waived his right to appeal on all but two grounds, Oehne now challenges (1) the district court's factual findings on his motion to suppress statements that he made on the day of his arrest and physical evidence obtained from the search of his residence on that day, and (2) the procedural and substantive reasonableness of the district court's sentence.

We turn first to Oehne's argument that the district court erred in denying his motion to suppress the inculpatory statements made on the day of his arrest and the physical evidence

2

obtained from the search of his residence. "The standard of review for evaluating the district court's ruling on a suppression motion is clear error as to the district court's factual findings, viewing the evidence in the light most favorable to the government, and *de novo* as to questions of law." *United States v. Rodriguez*, 356 F.3d 254, 257 (2d Cir. 2004). A factual finding is clearly erroneous only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) (internal quotation marks omitted); *see also United States v. Iodice*, 525 F.3d 179, 185 (2d Cir. 2008). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson*, 470 U.S. at 573-74. Thus, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.*

During the suppression hearing before the district court, the government offered testimony from Virginia State Trooper Tony Chrisley, a task force officer with the FBI in Virginia, and FBI Special Agent Odette Tavares. Oehne did not testify at the hearing or offer any evidence to dispute the officers' testimony. The officers testified that on March 31, 2009, they received an investigative lead when MV identified Oehne as her abuser and agents in Connecticut determed that Oehne resided in Virginia, where he had a pending state criminal case for alleged sexual abuse of another minor girl. Chrisley and Tavares initiated surveillance at a home address associated with Oehne. At approximately 3:19 p.m., they saw a man matching Oehne's description leave the house and get on a motorcycle. Chrisley exited his vehicle and asked the man if he was William Oehne. The man nodded, and Chrisley identified himself as a law

enforcement officer. Chrisley told Oehne that he was not under arrest, but that he was going to detain him until the agents secured the residence pending a search warrant.

At approximately 3:22 p.m., Chrisley handcuffed Oehne and placed him in the front seat of the car while the officers waited for additional law enforcement. While sitting in the parked car, Oehne began explaining that MV's mother called him the previous night. Realizing the call might relate to the investigation, Tavares interrupted Oehne and read him his rights from an Advice of Rights form. As she read the first line of the form, Oehne said that he had a lawyer. Chrisley asked Oehne if the lawyer was for his pending case in Virginia, and Oehne said yes. Tavares then read the form, line by line, and Oehne confirmed, after each line, that he understood his rights. After Tavares finished reading Oehne his rights from the form, she signed the form and handed it back to Chrisley, who also signed the form. Agent Tavares then wrote on the form that Oehne "was detained and refused to sign." J.A.178. The district court credited Taveras' testimony that Oehne had not actually refused to sign the form; instead, Oehne was never asked to sign the form because he was handcuffed and because Tavares stopped the questioning when Oehne indicated that he had an attorney.

After being advised of all his rights, Oehne again initiated conversation with the officers, saying that he "was not a bad guy." J.A. 251 (internal quotation marks omitted). At approximately 3:36 p.m., Oehne was released from his temporary detention and told that he was free to go except into his house, which the agents had secured pending a search warrant. Around this same time, Agent Tavares asked Oehne if it would be okay for them to do a protective sweep of the residence for officer safety. Oehne replied that it was okay and also said that they had his consent to search the residence. About ten minutes after he provided his oral consent, Oehne

4

signed consent forms for the search of his residence and vehicle. He later gave oral and written consent for the search of a shed on his property. During the search, Oehne stayed mainly on the porch and used his cell phone several times. Chrisley testified that Oehne was "cooperative, nice, cordial[,]" and that they "were talking like we [were] friends." J.A. 110. Oehne described, for example, how he had met MV's mother and the circumstances under which he had moved in with her and MV in Connecticut. The search uncovered various items of incriminating evidence, including distinctive rings that matched the rings worn by the abuser in the images of MV's sexual abuse and a camera containing images of four other girls.

At approximately 8:00 p.m., another FBI agent from Virginia approached and advised Oehne that he was under arrest. Oehne was read his rights, and he signed the Advice of Rights form. On the form, Oehne acknowledged that he was under arrest, that he wished to talk to the officers further, and that he had been read his rights. Oehne then proceeded to make various admissions, although he also attempted to minimize his conduct. He eventually provided a handwritten confession in which he made further admissions while continuing to minimize his crimes. Specifically, he wrote:

> [MV] asked me to take photos of her and they unintentionally got uploaded to Limewire. There was never any sexual relations with her, and I did the photos to make her happy. There was never any other abuse. There was never any penetration of any of her body parts. Upon discover[y] of the Limewire upload I immediately deleted the Limewire program. I feel horrible for any hardships this has caused anyone and there was never any intention of uploading or sharing photos. I am truly sorry for everything that has happened.

J.A. 431.

On appeal, Oehne asserts that he invoked his Fifth Amendment rights by stating that he had an attorney in another case and by not signing the first Advice of Rights form. This argument

5

is unavailing. In *Miranda v. Arizona*, the Supreme Court made clear that the prosecution may not use statements made by a suspect under custodial interrogation unless the suspect (1) has been apprised of his Fifth Amendment rights, and (2) knowingly, intelligently, and voluntarily waives those rights. 384 U.S. 436, 444-45 (1966). The Supreme Court later crafted a prophylactic rule to protect suspects from being pressured into waiving *Miranda* rights after invoking them, holding that "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). For a suspect to invoke his *Miranda* right to counsel, he must at a minimum make "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation*." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) (emphasis in original). "If an accused makes a statement concerning the right to counsel that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259-60 (2010) (internal quotation marks and citations omitted). Statements such as: "Maybe I should talk to a lawyer," *Davis v. United States*, 512 U.S. 452, 462 (1994) (internal quotation marks omitted); "Do you think I need a lawyer?" *Diaz v. Senkowski*, 76 F.3d 61, 63 (2d Cir. 1996); and a suspect's statement that he "was going to get a lawyer," *United States v. Scarpa*, 897 F.2d 63, 68 (2d Cir. 1990), have been found to be insufficient to constitute an unambiguous request for counsel. Similarly, the Supreme Court has held that an accused who wants to invoke his or her right to remain silent must do so unambiguously. *See Berghuis*, 130 S.Ct. at 2260.

6

In this case, Oehne did not unambiguously invoke his right to counsel. When Oehne advised the officers that he had a lawyer, he was referring to an attorney representing him in connection with separate pending charges in Virginia. To be sure, Oehne had a Sixth Amendment right to counsel with respect to this unrelated matter; however, the Sixth Amendment right to counsel is "offense specific," and its "effect of invalidating subsequent waivers in police-initiated interviews is [also] offense specific." *McNeil*, 501 U.S. at 175. With respect to the instant offense, Oehne never requested a lawyer, even tentatively --  he merely informed the officers that he had a lawyer for an unrelated charge. *See Delap v. Dugger*, 890 F.2d 285, 294 (11th Cir. 1989) ("[T]he mere indication that [the defendant] was represented by counsel in an unrelated matter does not constitute even an equivocal request for counsel."); *Talbert v. Conway*, No. 05 CV 1079, 2008 U.S. Dist. LEXIS 84495, at *5-*6 (E.D.N.Y. Oct. 20, 2008) ("Assuming that petitioner's Sixth Amendment right to counsel had attached on [one matter], where he had been arrested on a felony complaint and was awaiting arraignment, that right, under *McNeil*, plainly did not bar police from questioning petitioner about the unrelated [matter].") (emphasis omitted). Thus, it is clear that Oehne did not invoke his right to counsel.

Nor did Oehne invoke his Fifth Amendment right to remain silent. Although Oehne cites *United States v. Plugh*, 576 F.3d 135 (2d Cir. 2009) ("*Plugh I*"), for the proposition that a defendant may invoke his right to remain silent by refusing to sign a waiver form, we vacated and reversed *Plugh I* following the Supreme Court's decision in *Berghuis*, *supra*. In *United States v. Plugh*, 648 F.3d 118 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 1610 (2012) ("*Plugh II*"), we held that a refusal to sign a waiver of rights is "not necessarily equivalent to an unambiguous decision to *invoke* them." *Id.* at 125. Rather, as the Supreme Court made clear in *Berghuis*, "for a

7

defendant successfully to invoke his *Miranda* rights, he must do so through a clear, unambiguous affirmative action or statement." *Id.* at 124. Moreover, even if *Plugh I* were still good law, which it is not, it would be distinguishable because the evidence in the record indicates that Oehne did not refuse to sign the first Advice of Rights form -- he was simply never asked to sign it.

Finally, even assuming *arguendo* that Oehne did invoke his Fifth Amendment rights, he waived those rights by thereafter spontaneously discussing his offense conduct with the officers. "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis*, 130 S. Ct. at 2262. Here, after Oehne indicated that he understood the *Miranda* warnings he had been given, he voluntarily initiated a conversation with the officers on the subject of the investigation. As the district court found, the officers did not encourage Oehne to speak with them or otherwise interrogate him; he chose to speak with them despite the fact that he was not under arrest and, indeed, was free to walk around the outside of his residence, use his cellular telephone, and leave the property entirely. Later in the day, after Oehne had been given a second set of *Miranda* warnings, he executed a written *Miranda* waiver and provided a handwritten statement. Accordingly, the district court did not err in finding that Oehne voluntarily waived his rights.

Oehne's arguments with respect to the search of his residence are all based on the premise that the district court erred in concluding that Oehne did not invoke his Fifth Amendment rights. Because the district court did not err in reaching this conclusion, Oehne's challenge to the district court's denial of his motion to suppress physical evidence obtained from the search of his residence must fail as well.

8

We turn next to Oehne's challenge to the district court's sentence. We review all sentences using a "deferential abuse-of-discretion standard." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted). Our review has "two components: procedural review and substantive review." *Id.* We "first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007). We then review the substantive reasonableness of the sentence and reverse only when the district court's sentence "cannot be located within the range of permissible decisions." *Cavera*, 550 F.3d at 189 (internal quotation marks omitted).

None of Oehne's challenges to the procedural reasonableness of the district court's sentence is colorable. The district court correctly found that because Oehne pled guilty to two counts which together carry a statutory maximum penalty of fifty years, the guidelines sentence was fifty years or 600 months. *See* U.S.S.G. § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence."). Oehne does not argue that this calculation was improper. Nor does he contend that the district court improperly treated the Guidelines as mandatory, as the district court explicitly acknowledged that it was not bound by the Guidelines.[1] In fact, the Guidelines recommended life imprisonment. Moreover, contrary to

_____

[1] *See* J.A. 468 ("The record should not suggest that I don't understand that I have the power to impose the sentence that I think is appropriate after consideration of all of the factors,

9

Oehne's suggestion on appeal and as explained further below, the district court carefully considered the factors it is required to consider pursuant to 18 U.S.C. § 3553(a).

Oehne's central challenge to the district court's sentence, therefore, is to its substantive reasonableness. Oehne relies heavily on *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010), a case in which we held that a sentence of 240 months' imprisonment for a first-time offender who pleaded guilty to distribution of child pornography was procedurally and substantively unreasonable. *Id.* at 188. In so doing, we observed that courts determining sentences for offenses involving child pornography must be careful not to impose sentences that do not conform with the Section 3553(a) factors. *Id.* at 184-88. We also noted that we were troubled by the district court's imposition of the statutory maximum in that case because the district court (1) apparently assumed that the defendant "was likely to actually sexually assault a child, a view unsupported by the record evidence," *id.* at 183; (2) offered only a "cursory explanation of its deterrence rationale," *id.* at 184; and (3) incorrectly stated that its sentence was "relatively far below" an improperly-calculated Guidelines range, *id.* (internal quotation marks omitted).

*Dorvee* is readily distinguishable from this case. Unlike the defendant in *Dorvee*, Oehne actually sexually assaulted a child. Specifically, he sexually abused a young girl over the course of a two-year period, starting when she was only eight years old. He photographed the abuse and distributed the images over the internet, where they have been viewed by thousands worldwide. Indeed, over 3,000 offenders have been found in the United States with MV's images, a number the district court found is "probably the tip of the iceberg." J.A. 528. The district court explained

---

and I'm not bound by the guidelines so in some respects the discussion of whether the guidelines are right or not, is in my view beside the point. I always calculate them and they are important and they have to be calculated. That isn't the end of the analysis.").

that Oehne's distribution of these photographs has subjected MV to a "lifelong constant revictimization." J.A. 531. The district court also considered the need to protect the public from Oehne's crimes; it heard testimony from the mother of another young girl who had been lured along with her friends into Oehne's apartment with toys and makeup. Sexually explicit photographs of this girl were found in Oehne's camera. The district court therefore found "a pattern . . . of grooming and abusing very young girls." J.A. 534. Additionally, the district court considered Oehne's "attempt[] . . . to downgrade or suggest lack of responsibility for what [he had] done in terms of . . . uploading the pictures to the Internet, about the victim's attitude toward what [he was] doing to her, [and] the victim's role in what happened." J.A. 533. In sum, the district court stated:

> As a society, we have an obligation to people who are helpless who can't care for themselves and that's children. And we as a society, have an obligation to protect our children and when someone undertakes a vicious assault upon a child and does it not once in a moment of weakness but does it over and over again, then proceeds to record it and then share the recording of it, with . . . hundreds of thousands of people, maybe millions. . . . In my view, that has to rank among the most serious crimes we have. I wouldn't want to diminish this crime if it were a 12 or 14 year old. I wouldn't want to diminish the seriousness of it if you did it once. I wouldn't want to diminish the seriousness of it if you took no pictures of it. It would still be a serious crime but you did all of those things.

J.A. 528-29.

Thus, while *Dorvee* advised district courts to exercise caution in imposing sentences for child pornography offenses at or near the statutory maximum "even in run-of-the-mill cases," this is not a run-of-the-mill case. *Dorvee*, 616 F.3d at 186. To the contrary, the district court found that Oehne's crimes were "among the most serious crimes we have." J.A. 528. Accordingly, we conclude that the district court's sentence was reasonable under the totality of the circumstances.

11

We  have considered Oehne's remaining arguments and find them to be without merit.

For the reasons stated herein, the judgment of the district court is **AFFIRMED**.