**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-2160
_____

PAUL RICHARD MCGANN,
Appellant

v.

CINEMARK USA, INC.

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 2-15-cv-00423)
Chief Magistrate Judge:  Honorable Maureen P. Kelly

_____

Argued: November 10, 2016

Before:  SMITH, *Chief Judge*, MCKEE, and RESTREPO,
*Circuit Judges*

(Opinion Filed:  October 6, 2017)
_____

Carol A. Horowitz                    [ARGUED]
Jeffrey M. Skakalski
Disability Rights Network of Pennsylvania
429 Fourth Avenue
Suite 701
Pittsburgh, PA 15219
        *Counsel for Appellant*

M. Brett Burns                    [ARGUED]
Hunton & Williams
575 Market Street
Suite 3700
San Francisco, CA 94105

Bridget J. Daley
Brian H. Simmons
Buchanan Ingersoll & Rooney PC
One Oxford Center, 20th Floor
301 Grant Street
Pittsburgh, PA 15219
        *Counsel for Appellee Cinemark USA, Inc.*

Vanita Gupta
Tovah R. Calderon
Bonnie I. Robin-Vergeer            [ARGUED]
United States Department of Justice
Civil Rights Division, Appellate Section
P.O. Box 14403
Ben Franklin Station
Washington, DC 20044
        *Counsel for Amicus Curiae United States of America*

_____

OPINION OF THE COURT

RESTREPO, *Circuit Judge.*

The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, requires public accommodations, including movie theaters, to furnish auxiliary aids and services, which include qualified interpreters, to patrons with vision, hearing, and speech disabilities. Plaintiff-Appellant Paul McGann, who is blind and deaf, requested from Defendant-Appellee Cinemark USA, Inc. ("Cinemark") an American Sign Language ("ASL") tactile interpreter so that he could experience a movie in his local Cinemark theater during one of its regular showings. Cinemark denied his request, and McGann then filed this suit under the ADA.

After a bench trial in which the parties stipulated to all relevant facts, the District Court entered Judgment in favor of Cinemark. It reasoned that McGann's requested tactile interpreter was not an auxiliary aid or service under the ADA and that the ADA did not require movie theaters to change the content of their services or offer "special" services for disabled patrons. For the following reasons, we will vacate the Judgment and remand for consideration of Cinemark's available defense.

**I.**

**A.**

3

McGann has Usher's Syndrome Type 1, a sensory disorder. He was born deaf and began losing his sight at age five. He has been completely blind for approximately fifteen years, and he is now considered deaf-blind. There is no single universally accepted method of communication for people who are deaf-blind. McGann generally uses ASL to communicate with others. ASL is a unique language that has its own idioms, grammar, and syntax.

McGann can expressively communicate by signing in ASL himself. He receptively communicates with the assistance of ASL tactile interpreters.
There are numerous methods of ASL tactile interpretation. McGann most commonly uses the hand-over-hand method. The hand-over-hand method involves the recipient placing his hands lightly upon the hands of an interpreter, who is signing in ASL, and reading those ASL signs through touch and movement.

ASL tactile interpretation of a movie includes every possible element of that movie's content, including visual, aural, and oral components. In addition, because tactile interpretation in almost any venue includes a descriptive component, interpretation of a movie screening will include environmental elements, such as other viewers' contemporaneous reactions. Given practical limitations, tactile interpreters cannot communicate *all* elements of a movie verbatim; they must, at times, make judgment calls about what content to skip. But tactile interpretation of a movie does not require any changes to the video or audio content of the movie, the auditorium screens or sound systems, or the physical environment—including the lighting—in or around the theater.

McGann has experienced movies in theaters for many years. He enjoys attending movies in person for a number of reasons; among others, it affords him the opportunity to participate in discussions about the movies with his friends and family. Before his wife passed away in 2001, she would provide him with tactile interpretation during movies in the theater. Since then, McGann has attended movies at a local Carmike Cinema. Carmike provided him with tactile interpretation services for movie presentations at his request.

In November 2014, McGann became interested in experiencing the movie *Gone Girl* (Twentieth Century Fox Film Corp. 2014), after hearing about it from his family and reading about it online using Braille. After he contacted his customary Carmike Cinema to inquire about attending a presentation of the movie, he learned it was no longer playing there. So he sought another theater in which to experience it.

Cinemark owned another theater in McGann's local area, Cinemark Robinson Township and XD Theater ("Cinemark Robinson"). As of December 2014, Cinemark was the most geographically diverse, worldwide exhibitor of movies, with 335 theaters and 4,499 movie screens in the United States, spread across forty-one states, including Pennsylvania. Cinemark makes assistive listening devices, closed captioning devices, and descriptive narration devices available in its U.S. theaters to patrons who are disabled. But given McGann's disability, none of those devices would help him experience a movie.

Having learned that Cinemark Robinson still offered *Gone Girl*, McGann e-mailed the theater directly to request tactile interpretation services that would allow him to

5

experience the movie during one of its regular presentations. After receiving no response to his initial inquiry, McGann contacted Cinemark Robinson again and was directed to senior paralegal Leslie Petengill, who worked in Cinemark's national headquarters in Texas. He reached out to Petengill that same day.

Cinemark had never received a request for tactile interpretation services for a patron who was deaf-blind before McGann's request. Petengill and Cinemark investigated McGann's request by contacting the Center for Hearing and Deaf Services ("HDS"), which provided Cinemark with quotes for tactile interpretation services. Rates ranged between $50 and $65 per hour, for a minimum of two hours. Because HDS considered tactile interpretation of *Gone Girl* a complex assignment, with a duration of over two hours, it would have required two interpreters.

Petengill denied McGann's request for tactile interpretation services on December 15, 2014, via e-mail, on her own authority. The e-mail explained that Cinemark did not believe that the ADA required Cinemark to provide McGann with tactile interpretation services for the purpose of "describ[ing] the movie [McGann] [would] [be] attending." As of January 2016, Cinemark had not received any other requests to provide tactile interpretation services to any patron who is deaf-blind.

McGann filed suit against Cinemark in March 2015, alleging that the theater violated Title III of the ADA when it denied his request for tactile interpreting services. In his suit, he sought declaratory relief, attorneys' fees, and costs. After discovery, the parties did not file dispositive motions. They

agreed to a non-jury trial before the District Court presented through pretrial briefs, amended joint stipulations of fact, joint exhibits, and oral argument. Oral argument was held in January 2016. The District Court entered Judgment for Cinemark in April 2016. This timely appeal followed.[1]

**B.**

With an understanding of the factual and procedural background of McGann's claim, we turn to the statutory and regulatory framework under which his claim arises. Congress enacted the ADA in 1990 as a "clear and comprehensive national mandate" designed to eliminate discrimination against individuals with physical and mental disabilities across the United States. 42 U.S.C. § 12101(a)(1), 12101(b)(1); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674-75 (2001). To help "effectuate its sweeping purpose," Congress enacted Title III of the ADA, which prohibits "public accommodations" from discriminating against individuals on the basis of disability. *PGA Tour*, 532 U.S. at 675; 42 U.S.C. § 12182(a). "Public accommodations" span "12 extensive categories" and include "a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment." *PGA Tour*, 532 U.S. at 676, 676 n.24 (citing 42 U.S.C. § 12181(7)).

Title III begins with a "[g]eneral rule" that "[n]o individual shall be discriminated against on the basis of

---

[1] The Civil Rights Division of the United States Department of Justice has submitted an amicus brief in support of McGann and urges us to reverse the District Court Judgment.

7

disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). "The term 'discrimination' is not directly and uniformly defined in Title III." *Menkowitz v. Pottstown Mem'l. Med. Ctr.*, 154 F.3d 113, 116 (3d Cir. 1998). "Instead, the statute provides several 'general prohibitions,'" which bar broad categories of conduct "that constitute discrimination for purposes of the general rule found in 42 U.S.C. § 12182(a)." *Id.* (citing 42 U.S.C. § 12182(b)(1)(A)(i)-(iii)). These general prohibitions include, *inter alia*, denying an individual on the basis of a disability "the opportunity . . . to participate in or benefit from the goods [or] services" of a public accommodation. 42 U.S.C. § 12182(b)(1)(A)(i).

Congress supplemented the general prohibitions against discrimination in Title III with several "specific prohibitions," which also constitute discrimination "for purposes of the general rule announced in 42 U.S.C. § 12182(a)." *Menkowitz*, 154 F.3d at 117 (citing § 12182(b)(2)(i)-(iv)); *see also Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128 (2005). One such "special prohibition," *see* 42 U.S.C. § 12182(b)(2)(A)(iii), pertains to "auxiliary aids and services." [2] Section 12182(b)(2)(A)(iii) requires public accommodations to "take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals *because of the absence of auxiliary aids and*

---

[2] We refer to this "special prohibition" throughout this Opinion as the "auxiliary aids and services requirement" of Title III.

8

*services*." *Id.* § 12182(b)(2)(A)(iii) (emphasis added). Failure to take such steps amounts to prohibited discrimination unless the accommodation shows that providing the auxiliary aid or service would "fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered" or "would result in an undue burden." *Id.* § 12182(b)(2)(A)(iii).

In addition to the text of the statute itself, the Department of Justice ("DOJ") issued a specific regulation implementing Title III's auxiliary aid and service requirement.[3] This regulation, 28 C.F.R. § 36.303, begins with a general rule, virtually identical to the auxiliary aid and service provision of Title III: "A public accommodation shall take those steps that may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals *because of the absence of auxiliary aids and services*," subject to the fundamental alteration and undue burden exceptions. *Id.* § 36.303(a) (emphasis added). The regulation also includes an effective communication

---

[3] The ADA directed the Attorney General to "issue regulations . . . to carry out the provisions" of Title III, 42 U.S.C. § 12186(b), and to provide "appropriate technical assistance manuals to individuals or entities with rights or duties" under Title III. *Id.* § 12206(c)(3). In accordance with this directive, the DOJ published its original set of regulations pertaining to Title III in 1991. In September 2010, it published revised regulations addressing, *inter alia*, the auxiliary aid requirement of Title III. *See generally* 28 C.F.R. § 36.101, *et seq*.

9

requirement, stating that public accommodations must "furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." *Id.* § 36.303(c)(1). DOJ regulatory guidance notes that the duty to provide effective communication with customers is "implicit" in the duty of a public accommodation to provide auxiliary aids and services. *Id.* Pt. 36, App. A.

The ADA supplies a definition for "auxiliary aids and services." The term includes, in relevant part: (1) "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments"; (2) "qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments"; and (3) "other similar services and actions." 42 U.S.C. § 12103(1)(A)-(B), (D). DOJ implementing regulations offer a non-exhaustive list of auxiliary aids and services that may be required to "ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(b), (c)(1); *see also Id.* Pt. 36, App. A (explaining that the list of auxiliary aids provided in Section 36.303 is non-exhaustive). This list includes "[q]ualified interpreters on-site." *Id.* § 36.303(b)(1). DOJ regulatory guidance on auxiliary aids and services notes that "if a deaf and blind individual needs interpreting services, an interpreter who is qualified to handle the interpreting needs of that individual may be required." *Id.* Pt. 36, App. A.

The DOJ also issued a Technical Assistance Publication in 2014 that provided guidance on communicating effectively with individuals who have vision, hearing, or speech disabilities. *See* Dep't of Justice, *ADA Requirements: Effective Communication* (Jan. 31, 2014),

10

http://www.ada.gov/effective-comm.htm. This publication specifically mentions tactile interpreters as auxiliary aids or services that may be used to communicate with individuals who are deaf-blind. *Id.*

DOJ regulations caution that public accommodations cannot expect a one-size-fits-all approach to satisfy their obligations under the ADA. "The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 36.303(c)(ii).

Consistent with the text of Title III, the regulations provide that a public accommodation may avoid ADA liability for failure to provide an auxiliary aid or service only if it shows that the aid or service in question "fundamentally alter[s] the nature" of its goods or services, or "would result in an undue burden, i.e., significant difficulty or expense." *Id.* § 36.303(a). The regulations also specify that a public accommodation is not required to "alter its inventory to include accessible or special goods," such as "Brailled versions of books," audio books, or other items "that are designed for, or facilitate use by, individuals with disabilities." *Id.* § 36.307.

This appeal centers on the meaning of Title III's auxiliary aids and services requirement. With an understanding of the statutory and regulatory context surrounding that requirement, we turn to the merits of McGann's claim.

## II.

11

The District Court had jurisdiction over this suit pursuant to 28 U.S.C. § 1331. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. In the context of a bench trial, we exercise plenary review over the District Court's conclusions of law and review findings of fact for clear error. *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 282-83 (3d Cir. 2014).

## III.

There is no dispute that McGann is disabled within the meaning of the ADA. There is also no dispute that Cinemark is a public accommodation under Title III of the ADA. The issue we must resolve in this appeal is whether Cinemark's failure to provide McGann with a tactile interpreter,[4] so that he could experience the film *Gone Girl* in one of its theaters, constitutes a Title III "special prohibition" regarding auxiliary aids and services and thus violates Title III's "general rule" that no individual shall be denied the "full and equal enjoyment of the goods [and] services" of "a place of public accommodation." 42 U.S.C. § 12182(a). The District Court found that Title III did not obligate Cinemark to honor McGann's request because (a) his requested tactile interpreter

---

[4] As discussed in Section I, two tactile interpreters would be necessary for McGann to experience *Gone Girl*. We refer to "interpreter" in the singular here for the sake of simplicity, because the number of interpreters requested has no bearing on whether Title III entitles McGann to this type of auxiliary aid or service under the ADA. It may, however, bear on whether providing this service imposes an undue burden on Cinemark, which we discuss *infra*.

12

was not an "auxiliary aid or service" that satisfied the statutory definition, and (b) McGann was not excluded from or denied Cinemark's services by the theater's denying him a tactile interpreter to experience the movie.

**A.**

We begin by considering whether, in the context of this case, McGann's requested ASL tactile interpreter is an "auxiliary aid or service." As detailed above, the ADA defines the term to include (1) "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments"; (2) "qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments"; and (3) "other similar services and actions." 42 U.S.C. § 12103(1)(A)-(B), (D). DOJ regulations include "qualified interpreters" among examples of auxiliary aids and services, 28 C.F.R. § 36.303, and DOJ technical assistance materials specifically mention tactile interpreters as auxiliary aids or services, Dep't of Justice, *ADA Requirements: Effective Communication* (Jan. 31, 2014), http://www.ada.gov/effective-comm.htm.

Cinemark did not dispute that the ASL tactile interpreter requested by McGann was a "qualified interpreter." Nor did it dispute that the tactile interpretation provided by this "qualified interpreter" would "make aurally delivered material[]" and "visually delivered material[]" available to McGann, who has both hearing and visual impairments. 42 U.S.C. § 12103(1)(A)-(B). Therefore, McGann's requested ASL tactile interpreter "fall[s] comfortably within the scope of th[e] definition" of "auxiliary aids and services" provided in

13

the text of the ADA and DOJ regulations. *Arizona ex rel. Goddard v. Harkins Amusement Enter., Inc.*, 603 F.3d 666, 674 (9th Cir. 2010). The DOJ, participating in this appeal as amicus curiae in support of McGann, agrees. *See* DOJ Amicus Br. 14, 24 (stating that "[a]n ASL tactile interpreter falls within the [ADA]'s and the regulation's definitions of 'auxiliary aids and services'").

Despite the District Court's acknowledgement that "'qualified interpreters' are specifically listed in the ADA and the Federal Regulations as an example of an auxiliary aid," App. 16, it found that McGann's requested tactile interpreter did not meet the definition of "auxiliary aids and services." The District Court explained that the word "auxiliary," as defined in the dictionary, connotes something that has a "supplemental" relationship to something else, not something that is "altogether new or different." App. 16 (citing *Webster's Third New Dictionary, Unabridged*, s.v. "auxiliary," http://unabridged.merriam-webster.com). Relying on this definition, it reasoned that since the service that Cinemark provides—presenting movies—did not already include tactile interpretation, tactile interpretation would be a new, not supplementary, service and was therefore not an "auxiliary" service under 42 U.S.C. § 12103(1) and 28 C.F.R. § 36.303.

There are several problems with how the District Court interpreted "auxiliary aids and services" in this case. Most broadly, applying the District Court's definition would render the auxiliary aids and services requirement of Title III meaningless. All of the products, technologies, and services explicitly listed in the statute and regulations as examples of auxiliary aids and services would constitute "new" goods or services escaping Title III's mandate unless they were *already*

14

provided by a public accommodation voluntarily. In effect, no public accommodation would need to provide them in the first place. We decline to interpret Title III and the DOJ regulations in such a manner. *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 736 F.3d 198, 209 (2d Cir. 2013) (explaining that courts should "interpret statutes to give effect, if possible, to every clause and word" rather than render some of them meaningless); *see also United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543 (1940) (cautioning courts against construing statutes in a way that would produce "absurd" results).

Second, the District Court need not have resorted to dictionary definitions of the word "auxiliary" to understand the meaning of "auxiliary aids and services" in Title III, since the statute and DOJ regulations specifically define the term. *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning."); *Meese v. Keene*, 481 U.S. 465, 484-85 (1987) ("It is axiomatic that the statutory definition of the term excludes unstated meanings of that term."). The statute contains no ambiguity as to whether a qualified interpreter fell within those definitions; it was specifically listed as an example of an "auxiliary aid or service."

Third, even if there had been a reason to consult a dictionary, the District Court overlooked another definition provided for "auxiliary." The *primary* dictionary definition provided for the term "auxiliary" in the very same dictionary cited by the District Court is "offering or providing help, assistance, or support." *Webster's Third New Dictionary, Unabridged*, s.v. "auxiliary," http://unabridged.merriam-

15

webster.com; *see also Oxford English Dictionary*, s.v. "auxiliary," http://www.oed.com (offering as the primary definition for "auxiliary": "helpful, assistant, affording aid, rendering assistance, giving support or succor"). The relevance of this primary definition—"offering help"—in this context is self-evident. The relevance of a secondary definition—"supplementary" —is not.

Finally, if we were to embrace the "supplementary" definition of "auxiliary," McGann's requested tactile interpreter would still satisfy this definition. As the Ninth Circuit pointed out in *Harkins*, "movie theaters' primary service is to screen films." 603 F.3d at 674. Providing tactile interpretation of a film being presented in a movie theater is "not so removed from a theater's usual business that [it] cannot be deemed [a] 'subsidiary' or 'supplemental'" service. *Id.*

For all of these reasons, we conclude that the tactile interpreter McGann requested is an "auxiliary aid or service" that satisfies Title III.

**B.**

Having determined that a tactile interpreter meets the definition of "auxiliary aid or service" laid out in the ADA and DOJ implementing regulations, we consider whether Cinemark's failure to provide tactile interpretation of the movie *Gone Girl* excluded McGann from or denied him Cinemark's services. The District Court found that it did not. We disagree.

In finding in favor of Cinemark, the District Court adopted Cinemark's argument that "Title III only ensures that

16

people with disabilities are not denied access to places of public accommodation" and the services offered at those places, but it does not "require a . . . public accommodation to provide . . . goods and services specially designed for disabled persons." App. 10. Since Cinemark did not provide tactile interpretation services for its movies in its normal course of business, the District Court reasoned, tactile interpretation was a "special" service not required under the law. This "special goods and services" rule may have a foundation in Circuit precedent and DOJ regulations, but those authorities do not support the District Court's extension of the rule to the auxiliary aids and services requirement.

The District Court distilled the "special goods and services" rule primarily from a line of circuit authority in which disabled individuals claimed that Title III required insurance companies to alter or modify their insurance policy products in some way. For instance, in *McNeil v. Time Insurance Company*, the plaintiff had purchased a health insurance policy that capped AIDS-related benefits. 205 F.3d 179, 182 (5th Cir. 2000). Not long after acquiring the policy, the plaintiff was diagnosed with AIDS and incurred related medical bills that exceeded the policy's cap. *Id.* The plaintiff filed suit, claiming that the insurer's failure to cover his excess medical expenses constituted prohibited discrimination under Title III of the ADA. *Id.* at 182-83.

The Fifth Circuit upheld the district court's dismissal of the plaintiff's Title III claim, holding that Title III did not reach the terms of the policies sold by the insurer since "a business is not required to alter or modify the goods or services it offers to satisfy Title III." *Id.* at 186. The Court explained that "[t]he provisions in §§ 12182(b)(1)(A)(i)-(iii) concerning the

17

opportunity to benefit from or to participate in a good or service"—Title III's "general prohibitions"—"do not imply that the goods or services must be modified to ensure that opportunity or benefit. Rather, this section only refers to impediments that stand in the way of a person's ability to enjoy that good or service in the form that the establishment normally provides it." *Id.* at 186 n.9.

Numerous other Circuits, including ours, have applied this reasoning in similar insurance benefits cases.[5] Several of these cases cited to the DOJ regulation, 28 C.F.R. § 36.307(a), which provides the same general rule: a public accommodation is not required to "alter its inventory to include accessible or special goods that are designed for, or facilitate use by,

---

[5] *See Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1105, 1115 (9th Cir. 2000) (holding that an insurer could not be held liable under Title III of the ADA for limiting mental illness benefits because the ADA did not require the provision of different goods and services); *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 558 (7th Cir. 1999) (holding that an insurance company was not required to offer a different insurance policy to individuals with AIDS than it offered to other individuals, because the ADA "d[id] not regulate the content of insurance policies"); *Lenox v. Healthwise of Ky., Ltd.*, 149 F.3d 453, 456-57 (6th Cir. 1998) (holding that defendant's health coverage policy did not violate the ADA by excluding coverage for certain types of transplant procedures that affect particular categories of disabled individuals); *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 613 (3d Cir. 1998) (explaining that "an insurance office . . . need not provide insurance that treats the disabled equally with the non-disabled").

individuals with disabilities," such as "Brailled versions of books." 28 C.F.R. § 36.307(a); *see also Doe*, 179 F.3d at 559.

The District Court extended the reasoning of this line of authority to the auxiliary aids and services requirement, finding that because Cinemark does not normally offer tactile interpretation of movies for any of its patrons during regular screenings, tactile interpretation would be a "special" service that is not required under these cases. The District Court's conclusion, in the context of the statutory scheme, meant that the "special goods and services" rule served as a limitation on Title III's mandate that public accommodations provide auxiliary aids and services.

Critically, however, none of the cases in the *McNeil, Doe* and *Weyer* line of authority turned on—or even touched on—the auxiliary aids and services requirement. So even if this line of authority were to stand for the general proposition that public accommodations do not have to provide different products or services for their patrons with disabilities, those cases say nothing about how the auxiliary aid and service requirement relates to this general proposition. Those circuits had no reason to consider the question. Likewise, 28 C.F.R. § 36.307(a) does not address the auxiliary aids and services requirement.

The Ninth Circuit, in *Harkins*, *did* have occasion to examine the relationship between the "special goods and services" rule and the auxiliary aids and services requirement. The *Harkins* plaintiffs challenged under Title III the defendant's failure to provide closed captioning and descriptive narration to individuals with disabilities who sought to screen films in its movie theaters. 603 F.3d at 668-

19

69. The district court, relying on *McNeil* and *Weyer*, had dismissed the plaintiffs' claims, finding that the ADA did not require movie theaters to alter the content of the services provided. *Id.* at 670-71.

The Ninth Circuit reversed, holding that closed captioning and descriptive narration constituted "auxiliary aids and services" under the statute, which a movie theater must provide to patrons with disabilities under the ADA, subject to available defenses. *Id.* at 675. In doing so, the Court rejected the defendant's and the district court's extension of the reasoning in *Weyer* to limit the auxiliary aid and service requirement, 42 U.S.C. § 12182(b)(2)(A)(iii). The Court explained:

> In arguing that the ADA's requirement of auxiliary aids and services is limited by *Weyer*, [Defendant] puts the cart before the horse: *Weyer* does not limit subsection 42 U.S.C. § 12182(b)(2)(A)(iii)'s requirement that a public accommodation provide auxiliary aids and services; the requirement that establishments provide auxiliary aids and services limits *Weyer*'s general rule that public accommodations do not have to provide different services for the disabled. Although *Weyer* may be controlling in the provision of goods and services generally, here

> Plaintiffs are seeking an auxiliary aid, which is specifically mandated by the ADA to prevent discrimination of the disabled.

*Harkins*, 603 F.3d at 671-72.  We agree.

For the reasons pointed out in *Harkins* and already discussed here, the auxiliary aids and services requirement would be "effectively eliminate[d]" if limited by the "special goods and services" rule.  *Id.* at 672.  Unless already provided voluntarily, auxiliary aids and services would never be required, because "[b]y its very definition, an auxiliary aid or service is an additional or different service that establishments *must* offer the disabled."  *Id.* at 672 (emphasis added).  We, like the Ninth Circuit, reject this interpretation of Title III.  *See Starbucks Corp.*, 736 F.3d at 209; *Am. Trucking Ass'ns*, 310 U.S. at 543.

At a more fundamental level, the District Court's analogy to these insurance policy cases failed to account for the context-specific nature of the auxiliary aids and services requirement.  Insurance companies and retail stores, such as bookstores, generally offer goods and services that are different in type and in character from those offered by entertainment venues like movie theaters.  What constitutes a denial of or exclusion from those goods or services will differ accordingly.  Therefore, a court cannot simply assume that what satisfies Title III's auxiliary aids and services requirement in one context will necessarily satisfy it in another.  *Cf.* 28 C.F.R. § 36.303(c) (noting that the auxiliary aid or service required will vary according to the context in which a communication takes place).

21

A bookstore offers customers the ability to select and purchase books from the store's shelves and inventory. Our case law and 28 C.F.R. § 36.307(a) instruct that a bookstore may not need to offer Brailled versions of books, if doing so would require altering the mix of goods provided. *See* 28 C.F.R. § 36.307(a); *Ford*, 145 F.3d at 613. But we would have little trouble concluding that a bookstore had denied service to a customer if that customer was forbidden from perusing the store's existing selection or purchasing whatever book he or she chose. So, as the District Court's opinion implied and Cinemark does not dispute, the bookstore may need to provide an auxiliary aid or service to assist a customer who is blind with selecting and purchasing a book, so that he or she is not excluded from or denied the goods already offered by the bookstore, in violation of Title III.

Likewise, insurance companies offer customers a number of standardized insurance contracts available for purchase. An insurance company—that otherwise meets the definition of "public accommodation"—may not need to offer an insurance product tailored to disabled individuals, under *McNeil*, *Doe,* and similar cases. But it may need to provide an auxiliary aid and service that will communicate the contents of a written policy to a customer who is blind so that he or she can make an informed purchase.

The District Court seemed to assume, based on this line of authority, that a public accommodation's obligation to provide auxiliary aids and services does not extend beyond a patron or customer's selection of and payment for the good or service of interest. So as it pivoted in its opinion from bookstores and insurance companies to the entertainment

22

context, the District Court stated as a legal premise that Title III does not require art galleries to provide verbal descriptions of paintings, or concert halls to provide descriptions of the music being played. Instead, the District Court explained, Title III simply requires that paintings and performances on display "are accessible" to patrons with disabilities. App. 15. In other words, auxiliary aids and services are required only until a disabled patron has purchased a ticket and is situated in a place where he or she could perceive the entertainment, but for his or her hearing or vision disability. The District Court cited to no authority to support this specific legal premise, and Cinemark does not provide any on appeal, despite reiterating the same premise in its briefing.

As the DOJ pointed out in its amicus brief, it has regularly taken the position in litigating and enforcing the ADA that entertainment venues must provide auxiliary aids and services to make the *content* of their performances accessible to persons with vision and hearing impairments. Consistent with this position, the DOJ amended 28 C.F.R. § 36.303, after oral argument in this case, to require movie theaters, under their existing Title III obligations, to provide closed captioning and audio description for digital movies presented in those theaters' auditoriums.[6]   28 C.F.R. §

---

[6] These amendments to 28 C.F.R. § 36.303 impose specific and detailed requirements only on movie theaters presenting digital movies that are produced or distributed with closed captioning or audio description features; almost all new digital movie releases are distributed with such features. 28 C.F.R. § 36.303; 81 Fed. Reg. 87,348-01. Nevertheless, the supplementary information included with the DOJ's final rule repeatedly emphasizes that the rule does not change all movie

36.303(g)(2); *see also* Nondiscrimination of the Basis of Disability by Public Accommodations – Movie Theaters; Movie Captioning and Audio Description, 81 Fed. Reg. 87,348-01 (2016) (final rule) (codified at 28 C.F.R. Pt. 36). To the extent that the District Court relied on this legal premise to conclude that Title III did not obligate Cinemark to provide auxiliary aids and services during the movie presentation itself, that reliance was misguided.

Entertainment venues, such as concert halls and movie theaters, offer to the public something different than stores offering goods or products for purchase. They offer an entertainment *service*. As Cinemark acknowledged, customers do not pay these entertainment venues for tickets to sit in an empty auditorium. They pay to experience the entertainment being offered. App. 49 ("According to . . . Petengill, people 'come to the theatre to watch a movie, not just sit in a seat.'"); *see also Ball v. AMC Entm't, Inc.*, 246 F. Supp. 2d 17, 24 (D.D.C. 2003) (rejecting the same "special goods and services" argument advanced by defendant movie theaters and highlighting that the defendants had "fail[ed] to recognize that they are not similarly-situated to bookstores and video stores that provide goods because [they] provide the *service* of screening first run movies"). The provision of this entertainment service continues after a patron selects a movie of interest, purchases a ticket to that movie, and walks into the auditorium. So, too, does the obligation to provide auxiliary aids and services.

---

theaters' "longstanding" obligation "to provide effective communication to persons with disabilities through the use of auxiliary aids and services." 81 Fed. Reg. 87,348-01.

24

The District Court's interpretation of movie theaters' obligations under the auxiliary aids and services requirement is also inimical to the purposes of Title III, as reflected explicitly in the ADA itself, as well as in the legislative history of the statute. Among those problems Congress sought to address by enacting the ADA was the "serious and pervasive social problem" of "discrimination against individuals with disabilities" by "isolat[ing] and segregat[ing]" them in American society. 42 U.S.C. § 12101(a)(2). Congress stated in the text of the ADA that this isolation and segregation of individuals with disabilities persisted "in such critical areas as . . . public accommodations . . . [and] recreation." *Id.* § 12101(a)(3).

Indeed, data and testimony collected by Congress as it developed the ADA "painted a sobering picture of an isolated and secluded population of individuals with disabilities" who "d[id] not frequent places of public accommodation." S. Rep. No. 101-116, at 10-11 (1989); H.R. Rep. No. 101-485, pt. 2, at 34-35, *reprinted in* 1990 U.S.C.C.A.N. 303, 316. Due to communication barriers, among other reasons, the "large majority of people with disabilities d[id] not go to movies, d[id] not go to the theater, d[id] not go to see musical performances, and d[id] not go to sports events." S. Rep. No. 101-116, at 10-11; H.R. Rep. No. 101-485, at 34-35. "The extent of non-participation . . . in social and recreational activities [was] alarming." S. Rep. No. 101-116, at 10-11; H.R. Rep. No. 101-485 at 34-35. So, after its thorough and fact-intensive investigation, "Congress concluded that there was a 'compelling need' . . . to integrate [individuals with disabilities] 'into the economic and social mainstream of American life.'" *PGA Tour*, 532 U.S. at 675 (quoting S. Rep. No. 101-116; H.R. Rep. No. 101-485); *see also* 42 U.S.C. §

25

12101(a)(7) (among the "Nation's proper goals" are "equality of opportunity" for and "full participation" in American life by individuals with disabilities).

This legislative history reflects Congress' recognition that presenting movies in the theater is a component of the "social mainstream of American life." *PGA Tour*, 532 U.S. at 675 (quoting S. Rep. No. 101-116; H.R. Rep. No. 101-485). Indeed, our Supreme Court has commented on the importance of movies in American culture:

> It cannot be doubted that motion pictures are a significant medium for the communication of ideas. They may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression. The importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform.

*Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). If we interpret the auxiliary aids and services requirement to facilitate only the process of directing an individual with hearing or vision impairments to the right auditorium, which is showing a movie they cannot hear or see (or both), the requirement does little, if anything, to remediate the very problem Congress designed it to address.

For these reasons, we conclude that Cinemark's failure to provide McGann with a tactile interpreter for a presentation of the movie *Gone Girl* excluded him from or denied him Cinemark's services.

## C.

Having established that Title III's auxiliary aids and service requirement applies to McGann's request for a tactile interpreter to allow him to experience a movie in Cinemark's theater, we turn to Cinemark's available defenses. As discussed, Title III does not obligate a public accommodation to furnish a requested auxiliary aid or service if doing so would "fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered" or "would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(iii). The public accommodation bears the burden of showing either defense. *Id.*; 28 C.F.R. § 36.303.

Cinemark has asserted in this litigation its fundamental alteration defense. In its answer to McGann's complaint, it stated that providing McGann with his requested interpreter "would result in a fundamental alteration of the goods and services provided by Cinemark, as Cinemark does not provide sign language or tactile interpreters for any of its exhibitions in the normal course of business." App. 46. In its briefing to this Court, Cinemark describes its defense as "consistent with the 'accessible and special goods' rule articulated in 28 C.F.R. § 36.307." Appellee's Br. 49. For the reasons already discussed, this argument fails.

Moreover, Cinemark does not dispute that tactile interpretation of a movie does not require any changes to the video or audio content of the movie, the screens or sound systems that present the movie, or the physical environment—including the lighting—in or around the theater. We thus do not see how it constitutes "a modification that is so significant that it alters the essential nature of the . . . services," *see* Dep't of Justice, *ADA Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities*, at III-4.3600 (1993), that Cinemark provides, or alters the "fundamental character" of those services," *see PGA Tour*, 532 U.S. at 683. As the DOJ points out, "[f]or every patron in the theater who does not have a sensory disability and does not request an auxiliary aid, the 'fundamental character' of the movie remains unchanged." DOJ Amicus Br. 31.

**2**

Cinemark also asserted an undue burden defense. However, the District Court did not reach it, as it entered Judgment in favor of Cinemark on other grounds. DOJ regulations instruct that "undue burden" under Title III "means significant difficulty or expense." 28 C.F.R. § 36.104. The regulations also provide a lengthy list of factors for courts and public accommodations to consider when evaluating whether taking a particular action, such as providing a requested auxiliary aid or service, would result in an undue burden. These factors include:

> (1) The nature and cost of the action needed under this part;
> (2) The overall financial resources of the site or sites involved in the

28

action; the number of persons employed at the site; the effect on expenses and resources; legitimate safety requirements that are necessary for safe operation, including crime prevention measures; or the impact otherwise of the action upon the operation of the site;

(3) The geographic separateness, and the administrative or fiscal relationship of the site or sites in question to any parent corporation or entity;

(4) If applicable, the overall financial resources of any parent corporation or entity; the overall size of the parent corporation or entity with respect to the number of its employees; the number, type, and location of its facilities; and

(5) If applicable, the type of operation or operations of any parent corporation or entity, including the composition, structure, and functions of the workforce of the parent corporation or entity.

*Id.* Given the fact-intensive nature of the undue burden inquiry, we will remand this portion of the District Court's judgment for the District Court to undertake the inquiry in the first instance.

29

## IV.

For the foregoing reasons, we will vacate the District Court's entry of Judgment for the Defendant and remand the case for consideration of Cinemark's undue burden defense.